```
              UNITED STATES DISTRICT COURT
              EASTERN DISTRICT OF KENTUCKY
                    NORTHERN DIVISION
                      AT COVINGTON
```

**CIVIL ACTION NO. 2012-203 (WOB)**

**NIKLAS JENSIE**                                           **PETITIONER**

**VS.**          **FINDINGS OF FACT, CONCLUSIONS**
                      **OF LAW, AND ORDER**

**MARLENA JENSIE**                                          **RESPONDENT**


This is a Petition for Return of Child pursuant to 42 U.S.C. § 11601, *et seq.*, the International Child Abduction Remedies Act ("ICARA"), which implements the Hague Convention on the Civil Aspects of International Child Abduction.  This Court has original jurisdiction under 42 U.S.C. § 11603(a).

The Court held a preliminary hearing on October 11, 2012, and an evidentiary hearing on October 16 and 17, 2012, after which it orally entered a Judgment on Partial Findings on several issues, pursuant to Fed. R. Civ. P. 52(c).  The Court now issues the following written Findings of Fact and Conclusions of Law in support of its resolution of this matter.

### *Findings of Fact*

Petitioner Niklas Jensie ("Niklas"), a native and citizen of Sweden, met Respondent Marlena Jensie ("Marlena"), a native and citizen of the United States, in 1998. Marlena moved to Sweden in 2001, and the couple established a residence in Göteborg, Sweden, where Niklas's family lived. Niklas worked as a computer technician and Marlena, after attending Swedish educational courses, became employed as a preschool teacher. The couple married in 2003 while on a visit to Marlena's home state of Utah.

The couple's daughter, L.N.J.[1], was born on January 2, 2009, in Göteborg (Pet. Exh. 1), and she thus has default dual Swedish and American citizenship. Soon after their daughter's birth, Niklas and Marlena travelled to the United States for approximately four weeks[2] to visit Marlena's family so that they could meet L.N.J.

In 2010, Marlena became a Swedish citizen.

The couple began raising L.N.J. in Göteborg. In 2010, after Marlena returned to work from maternity leave, L.N.J. began attending a Swedish preschool. (Pet. Exh. 2).

---

[1] In compliance with the privacy requirements of the Federal Rules of Civil Procedure, the minor is identified only by her initials. Fed. R. Civ. P. 5.2(a).

[2] Niklas testified that he receives five weeks of vacation a year, which is typical in Sweden.

L.N.J. also spent time with Niklas's family and engaged in typical childhood activities. (Pet. Exh. 3).[3] While each parent spoke to L.N.J. in their native tongue, they dispute whether and to what degree L.N.J can speak Swedish. They agree, however, and the Court accepts, that L.N.J. understands Swedish.

The Jensies made no trips to the United States in 2010. In the summer of 2011, however, Niklas and Marlena again travelled with L.N.J. to the United States for vacation for approximately four to five weeks, visiting Marlena's family in several states. Other than these vacations, L.N.J. resided in Göteborg with her parents and attended preschool.

In late 2011, Niklas told Marlena that he wanted to separate. Marlena was upset by this news. The suggestion was made that Marlena travel to the United States to visit with her family and "clear her head." The parties disagree about whose idea the trip was, but the dispute is immaterial. Tickets were purchased for Marlena and L.N.J. to travel to the United States on December 13, 2011, with a booked return for February 5, 2012. (Pet. Exh. 4).

---

[3] The photographs in Exhibit 3 showing L.N.J. in Sweden are undated, but they clearly show her as an infant, a toddler, and at approximately her present age.

Marlena and L.N.J. did not return to Sweden as scheduled. Marlena testified that she did not return because Niklas had called her in January and told her that he was involved with another woman and wanted a divorce, which further upset her. In addition, her mother was ill. Niklas, however, testified that he had told Marlena before she left Sweden in December that he wanted a divorce. Again, this dispute is immaterial. What is material, and the Court so finds, is that Marlena did not return with L.N.J. as planned, and Niklas had not consented to the trip extending past February 5, 2012.

When Marlena did not return on February 5, Niklas called her and learned that she was still in the United States. Niklas immediately sought legal advice and contacted the Swedish government for assistance. He also began pleading with Marlena to return to Sweden.

On March 21, 2012, Niklas sent Marlena an email message, entitled "Come home, please," which states:

> Hi Lena,
>
> [A]s we spoke tonight about you coming home, you asked me to send you an e-mail to reassure you of some things before you are ready to come back home. I'm happy to do that for you.
>
> I, Niklas Jensie, promise you, that if you come home as we discussed, with the tickets I'm about to order for you, that when you and [L.N.J.] come back you can live in the apartment at Redbergsvägen 34, that I will

4

>   pay rent for, for the duration of you [sic] stay.  I will also make sure that you have the food that you and [L.N.G.] need when you are here.  I also agree to let you bring [L.N.G.] back to the US, when and if you decide to do so, as long as we have agreed upon, and signed custody papers.
>
>   Please confirm to me that this e-mail is enough for you and [L.N.J.] to come home as we have agreed.
>
>   //Niklas

(Pet. Exh. 5).

Marlena eventually agreed to return to Sweden with L.N.J. on April 5, 2012, using new tickets purchased by Niklas.[4]  Because the price for round-trip tickets was lower than that for one-way tickets, Niklas bought round-trip tickets with a randomly-chosen return date in May, 2012.  The Court accepts Niklas's testimony that the return date was not chosen with any intent that Marlena and Lily would actually return to the United States at that time.

When Marlena and L.N.J. returned to Sweden in April, Niklas moved out of the apartment they had been sharing and moved in with his sister.  During the next few months, Niklas and Marlena shared custody of L.N.J. and began meeting with Swedish social services to mediate their divorce and custody issues.  Niklas testified, and Marlena did not dispute, that the mediator cautioned her about the

---

[4] Niklas testified that the booked return tickets for February 5 were forfeited when Marlena and L.N.G. did not use them, so he had to buy new tickets.

seriousness of her prior refusal to return L.N.J. to Sweden in February.

Marlena testified that she believed that Niklas knew that it was her intention to return to the United States with L.N.J. once they had the custody issues worked out, and that the two had discussed various possible arrangements along those lines. Niklas, however, testified that he never consented for Marlena to take L.N.J. back to the United States to live and that, in fact, he was seeking an equal parenting schedule of every other week with custody of their daughter.

As will be discussed in more detail below, the Court finds that, even if Niklas had given consideration to Marlena's desire to return to the United States to live with L.N.J. after the couple's divorce was finalized, he had never consented to it, particularly at the time Marlena later left with L.N.J.

On June 7, 2012, Marlena sent Niklas an email stating:

Niklas,

My sweet husband. Please don't turn in the divorce papers just for the sake of getting moving on things. Can we stop fighting? I'm very sorry for my part. I apologize to you. Please accept my apology, sweetie. You are right, you have been better than that. I'm sorry I've said things out of hurt and anger and feeling cornered and trapped. I don't want to fight with you. It is bad for [L.N.J.]. Can we please work together to find a solution to things and do things

6

>together? That is what's best for our baby girl. I
>want to work with you for her best. Please wait on
>things. Please, can we give it more thought and
>together talk through solutions?
>
>Truly,
>Lena

(Pet. Exh. 13). Niklas nonetheless filed for divorce in early June.

The parties had a mediation scheduled for June 25, 2012. Niklas called the mediator, however, and indicated that he would not participate because he and Marlena were having major communication problems centering on their relationship, and that he therefore felt the session would not be productive with respect to working out custody issues. The mediation was rescheduled for July 5, 2012.

That evening, Niklas went to the apartment to see L.N.J. The parties dispute exactly what occurred, but suffice to say that Niklas testified that Marlena became upset and punched him several times in the groin, while he was holding L.N.J. Marlena's testimony was that Niklas pushed her and squeezed her breast, which prompted her to punch him in the groin. Marlena testified that this incident was only one example of how Niklas would use physical force during their arguments.

The Court adopts neither party's account of this incident, but instead concludes that the truth probably

7

lies somewhere between the two. Nonetheless, the incident was relatively minor and, the Court finds, isolated. While Marlena testified that there was a pattern of such conduct, she offered no specifics. Indeed, she conceded that she never called the police and never reported any abuse to the authorities in Sweden. Moreover, her email of June 7, 2012, seeking reconciliation with her husband belies her contention that the relationship was an abusive one. (Pet. Exh. 13).

L.N.J. spent the weekend of June 29-July 1, 2012 with her father, and he returned her to Marlena on July 1 without incident.

On the morning of July 2, 2012, Marlena sent Niklas a text message, stating:

> Do you really truly want to have [L.N.J.] every other week? Is that what you really want? Are you coming to samarbetssamtal[5]?

(Pet. Exh. 7). Niklas responded, "Yes." That evening, Marlena took L.N.J. to Niklas's father's home for dinner.

Marlena did not appear for the mediation on July 5. Alarmed, Niklas went to the apartment but Marlena and L.N.J. were not there. L.N.J.'s clothes and toys appeared undisturbed, however, and the apartment appeared normal.

---

[5] The parties agree that this Swedish word means "mediation" and refers to the mediation that was scheduled for July 5.

Niklas then discovered that Marlena's and L.N.J.'s passports were not in their normal place. Niklas then telephoned a friend of Marlena, who at first hung up on him but, after a second call, stated that she did want to get involved and that L.N.J. was safe.

That afternoon, Niklas's brother received an email from Marlena:

> Stefan,
>
> [L.N.J.] and I are fine. Please, can you go to the apartment and take care of the cats while we are away?
>
> Sincerly [*sic*],
> Marlena

(Pet. Exh. 8). Niklas's brother traced the internet provider address for this email to Cincinnati Bell. Niklas then concluded that Marlena had taken L.N.J. to Taylor Mill, Kentucky, where her father now resides.

The next day, July 6, 2012, Niklas contacted the Swedish Central Authority and filed an Application for Assistance Under the Hague Convention on Child Abduction requesting L.N.J.'s return to Sweden. (Pet. Exh. 9).

Niklas filed this petition on October 5, 2012. (Doc. 1). On October 10, 2012, the Göteborg District Court entered an order granting Niklas full custody of L.N.J. (Pet. Exh. 11).

### *Conclusions of Law*

The purpose of the Hague Convention is to "protect children internationally from the harmful effects of their wrongful removal or retention and to establish procedures to ensure their prompt return to the State of their habitual residence." *Robert v. Tesson*, 507 F.3d 981, 988 (6th Cir. 2007) (quoting Hague Convention, Preamble). The Convention seeks to "restore the pre-abduction status quo and to deter parents from crossing borders in search of a more sympathetic court." *Id.* (quoting *Friedrich v. Friedrich*, 78 F.3d 1060, 1064 (6th Cir. 1996)).

"When faced with a petition for return of a child under the Hague Convention, the courts of signatory nations may only determine the merits of the abduction claim; the merits of the underlying custody claim are not to be considered." *Id.* (citations omitted). *See also Friedrich*, 78 F.3d at 1065 (noting that merits of custody dispute are "forbidden territory" for court adjudicating Hague Convention petition for return of child").

Further, courts are directed to employ "the most expeditious procedures available" to adjudicate a petition seeking the return of a child under the Hague Convention and ICARA. *March v. Levine*, 249 F.3d 462, 474-75 (6th Cir. 2001). *See also id.* (holding that there is no requirement

10

under the Hague Convention or ICARA that discovery be allowed or that an evidentiary hearing be conducted; "fast track" proceedings are required).

To establish a prima facie case for the return of a child, a petitioner must demonstrate by a preponderance of the evidence that: (1) the child was habitually residing in one country and has been removed or retained in a different country; (2) the removal or retention was in breach of the petitioner's custody rights under the law of the country of habitual residence; and (3) the petitioner was exercising those rights at the time of the child's wrongful removal or retention. *McKie v. Jude*, Civil Action No. 10-103-DLB, 2011 WL 53058, at *5 (E.D. Ky. Jan. 7, 2011) (citations omitted).

Once the petitioner demonstrates wrongful removal or retention, the burden shifts to the respondent who may assert certain, narrow affirmative defenses. *Id.* One of these affirmative defenses is that "there is a grave risk that [the child's] return would expose the child to physical or psychological harm or otherwise place the child in an intolerable situation." *Simcox v. Simcox*, 511 F.3d 594, 604 (6th Cir. 2007) (quoting 42 U.S.C. § 11603(e)(2)(A)). The respondent must prove this affirmative defense by clear and convincing evidence. *Id.*

11

A.   **Habitual Residence**

"Habitual residence is not the same as the concept of domicile and neither one's nationality nor one's intent to return [to another country] play a role in determining one's habitual residence." *Fridlund v. Spychaj-Fridlund*, 654 F. Supp.2d 634, 637 (E.D. Ky. 2009) (citing *Friedrich v. Friedrich*, 983 F.2d 1396, 1401 (6th Cir. 1993)). "To determine the habitual residence, the court must focus on the child, not the parents, and examine past experience, not future intentions." *Friedrich*, 983 F.2d at 1401. *See also Robert v. Tesson*, 507 F.3d 981, 989 (6th Cir. 2007) (reiterating principles of *Friedrich* as the law of the Sixth Circuit).

"A person can have only one habitual residence. On its face, habitual residence pertains to customary residence prior to removal. The court must look back in time, not forward." *Friedrich*, 983 F.2d at 1401.

Here, the evidence shows that L.N.J. was born in Sweden on January 2, 2009, and, but for family vacations, lived there until December 2011, engaging in normal family activities and attending preschool. That is, Sweden was where she had been "present long enough to allow acclimatization" and where there was "a degree of settled

purpose from the child's perspective." *Robert*, 507 F.3d at 993 (citation omitted).

In December 2011, L.N.J. traveled to the United States with her mother, with the understanding that they would return in February 2012. The Court concludes that this trip of several months did not alter L.N.J.'s customary residence in Sweden. *See Blanc v. Morgan*, 721 F. Supp.2d 749, 760 (W.D. Tenn. 2010) (holding that fact that mother took child on extended trips to United States did not alter child's habitual residence of France).

That Marlena overstayed the February 2012 return by two months is also immaterial because time spent by a child in another country after any wrongful removal or retention does not factor into the "habitual residence" analysis. *Id.* at 1402. As the Sixth Circuit explained in *Friedrich*:

> The change in geography must occur before the questionable removal; here, the removal precipitated the change in geography. If we were to determine that by removing [the child] from his habitual residence without Mr. Friedrich's knowledge or consent Mrs. Friedrich "altered" [the child's] habitual residence, we would render the Convention meaningless. It would be an open invitation for all parents who abduct their children to characterize their wrongful removals as alterations of habitual residence.

*Id.*

The same is true, or course, with respect to the approximately three and a half months that L.N.J. has spent

here in the United States since her removal from Sweden in July. *Id.*

Moreover, although Marlena insists that she always intended to return to the United States to live with L.N.J., such parental future intentions generally do not factor into the Sixth Circuit's child-centric analysis. *See id.* ("Any future plans that Mrs. Friedrich had for [the child] to reside in the United States are irrelevant to our inquiry."); *McKie*, 2011 WL 53058, at *9 ("This approach to habitual residence is experience-driven; it focuses on the child's physical presence and the objective connections he has with a country, rather than looking to the parents' shared intent concerning where that child should live.").

Although the Court recognizes that the Sixth Circuit has left open the possibility that the subjective intentions of a "very young" or developmentally disabled child's parents may be important, *see Robert*, 507 F.3d 992 n.4, the Court concludes, based on the evidence in this case, that L.N.G.'s level of functioning and cognitive awareness would not bring this case within any such exception. *Cf. McKie*, 2011 WL 53058, at *10-13 (discussing relevance of parental intent in determining habitual residence of a newborn child).

14

Therefore, the Court concludes that L.N.J.'s habitual residence prior to July 2012 was Sweden.

### B. Custody Rights of Petitioner

Under Swedish law, married parents have joint custody by operation of law. *See Fridlund v. Spychaj-Fridlund*, 654 F. Supp.2d 634, 637-38 (E.D. Ky. 2009) (discussing Swedish law in Hague Convention case). Here, at the time of L.N.J.'s removal from Sweden in July 2012, there had been no judicial or administrative decision or agreement that altered Niklas's parental rights, and Marlena admitted this during the evidentiary hearing. Based upon the above facts, the Court also concludes that Niklas was exercising his custodial rights when L.N.J. was taken from Sweden.

Thus, to defeat a showing that removal was wrongful, Marlena has to prove by a preponderance of the evidence that Niklas consented to the removal. The Court has already found as a fact that Niklas did not consent to L.N.J.'s removal to the United States in July 2012, regardless of what the parties' prior discussions were regarding possible solutions to the custody dilemma.

Indeed, a parent's deliberately secretive actions is "extremely strong evidence" that the other parent would not have consented to removal. *Simcox v. Simcox*, 511 F.3d 594, 603 (6th Cir. 2007) (citation omitted). Here, Marlena

15

admitted that Niklas did not know she was leaving with L.N.J. when she did, and the surrounding circumstances indicate that she knew that Niklas would not have consented to L.N.J.'s removal to the United States. It is clear that when Niklas responded to Marlena's text message of July 2 confirming that he was indeed seeking a 50/50 shared parenting arrangement, Marlena panicked. Under questioning by the Court, she admitted as much, conceding that she was afraid what a Swedish court might do with respect to custody. As soon as Niklas learned of her departure with L.N.J., he immediately took steps to secure his daughter's return.

The Court thus has no doubt that Niklas did not consent to L.N.J.'s removal from Sweden.

### C. "Grave Risk" Affirmative Defense

"The 'grave risk' exception is to be interpreted narrowly, lest it swallow the rule." *Simcox*, 511 F.3d at 604 (citation omitted).

In considering the risk, the Court should focus on the time period between repatriation and the determination of custody by the courts in the child's homeland. *Id.* at 607.

In *Simcox*, the Sixth Circuit delineated three broad categories of abusive situations. First, in cases where the abuse it "relatively minor," the Court noted that it is

16

unlikely that the risk of harm to the child will rise to the level of a "grave" risk. *Id.* "Second, at the other end of the spectrum, there are cases in which the risk of harm is clearly grave, such as where there is credible evidence of sexual abuse, other similarly grave physical or psychological abuse, death threats, or serious neglect. *Id.* at 607-08. Third, there are cases that fall somewhere in the middle, "where the abuse is substantially more than minor, but is less than obviously intolerable." *Id.* at 608.

Although domestic violence may in some circumstances satisfy the "grave risk" exception, *id.* at 605, the Court concludes that Marlena's testimony, even if true, falls within the first category of cases identified in *Simcox*. That is, the incident she described, although unfortunate and no doubt upsetting, was relatively minor and isolated. Further, there is no allegation that Niklas ever physically abused L.N.J. or made abusive comments to her.

The evidence here thus stands in stark contrast to that which the Sixth Circuit found sufficient in *Simcox* to satisfy the "grave risk" defense. *See id.* at 608 (noting that abuse was both physical and psychological, including repeated beatings, hair pulling, ear pulling, belt-

17

whipping, and profane outbursts and abuse of the mother in the children's presence).

Therefore, the Court concludes that there is insufficient evidence that L.N.J., upon her return to Sweden, would be subjected to a "grave" risk of psychological harm.

Therefore, having heard the parties, and the Court being otherwise sufficiently advised,

**IT IS ORDERED** that:

(1) The Petition for Return of Child pursuant to 42 U.S.C. § 11601 be, and is hereby, **GRANTED**. Respondent is hereby **ORDERED** to deliver the child to the Petitioner at his hotel in Boone County, Kentucky **no later than FRIDAY, OCTOBER 19, 2012 AT 9:00 A.M.** so that the child may accompany Petitioner back to Sweden;

(2) Prior to that time, Respondent be, and is hereby, **ORDERED** that the child shall not be taken outside of the Greater Cincinnati Area, defined as the area within the I-275 beltway;

(3) Petitioner's counsel is hereby given leave to give Petitioner the child's passports;

(4)  Petitioner may travel to Sweden with the child on Friday, October 19, 2012, without further travel documents other than the child's passports; and

(5)  A separate judgment shall enter concurrently herewith.

This 18th day of October, 2012.



Signed By:
*William O. Bertelsman* WOB
United States District Judge